IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY**<br>5000 Overlook Avenue, SW<br>Washington, D.C.  20032<br><br>Plaintiff,<br><br>v.<br><br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**<br>1200 Pennsylvania Avenue, NW<br>Washington, D.C.  20460<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. _____ |

## COMPLAINT

Plaintiff District of Columbia Water and Sewer Authority ("DC Water") brings this action seeking declaratory and injunctive relief against Defendant United States Environmental Protection Agency ("EPA") and alleges as follows:

### INTRODUCTION

1.      This suit challenges final agency action taken by EPA on December 31, 2014, pursuant to the Clean Water Act, 33 U.S.C. §§ 1251 *et seq*. (the "Act" or "CWA"), approving the Total Maximum Daily Load for E. coli in the Potomac River and its tributaries (the "E. coli TMDL").

2.      The final agency action challenged in this suit takes the form of a letter dated December 31, 2014 from Jon M. Capacasa, Director, Water Protection Division, EPA, Region

III, to Hamid Karimi, Deputy Director, DC Department of the Environment together with EPA Decision Rationale.  The effect of this action was to approve the DC Department of the Environment's December 23, 2014 TMDL submission to EPA. That submission included: *E. coli Bacteria Allocations and Daily Loads for the Potomac River and Tributaries* (Appendix C), the *Comment Response Document* and other supporting documentation intended to supersede the 2004 TMDL which had been the subject of the suit in *Anacostia Riverkeepers v. Johnson*, Case No.: 1:09-cv-00098-JDB filed on January 15, 2009.  The Comment Response Document (Exhibit A), EPA's December 31, 2014 letter with Decision Rationale (Exhibit B), E. Coli Bacteria Allocations and Daily Loads for the Potomac River and Tributaries (Dec. 2014) (Exhibit C), are collectively referred to herein as the "EPA Approval Documents" and are attached to this Complaint.

3.       The E. coli TMDL revised and superseded the 2004 bacteria TMDL for the Potomac River and its tributaries in order to (1) change the indicator for bacteria from fecal coliform to E. coli based on EPA guidance and (2) include the daily loads required by a 2006 decision of the U.S. Court of Appeals for the District of Columbia Circuit.[1]  Neither of these purposes was designed or intended to reduce the bacteria loads allocated in the 2004 TMDL or otherwise establish WLAs more stringent than those established in the 2004 TMDL.

4.       After years of planning, study, design, engineering, and public participation in partnership with EPA and the Government of the District of Columbia (the "DC Government"), DC Water is investing $2.6 billion dollars in upgrades to the Blue Plains Advanced Wastewater Treatment Plant ("Blue Plains" or the "Plant") and the District of Columbia's combined sewer system in reliance on prior determinations by EPA and the DC Government that discharges from the combined sewer system and the Plant's two outfalls will comply with the EPA-approved 30-

---

[1] *See Friends of the Earth v. EPA,* 446 F.3d 140 (D.C. Cir. 2006).

day geometric mean E. coli water quality standard of  126 MPN[2]/100 milliliters ("ml") for the

Potomac River after the upgrades are placed in operation.

5.      Among the upgrades now underway at Blue Plains are hundreds of millions of

dollars in improvements designed to enable DC Water to comply with the limitations, standards,

and requirements that were added to the National Pollutant Discharge Elimination System Permit

issued for Blue Plains and District of Columbia's sewer system (the "NPDES Permit") in

reliance on the prior standards compliance determinations made by EPA and the DC

Government.

6.      This suit challenges the maximum daily waste load allocations ("WLAs")

assigned to Blue Plains' Outfalls 002 and 001.  At issue is EPA's approval of the E. coli TMDL

despite the fact that the maximum daily WLAs for Outfalls 002 and 001 not only fail to include

all of the E. coli loads that should have been lawfully allocated to these outfalls, but also fail to

provide the E. coli WLAs needed to enable DC Water to comply with the NPDES Permit. The

flawed WLAs put at risk the hundreds of millions of dollars that DC Water is currently investing

in upgrades to Blue Plains in reliance on EPA's prior determinations that discharges from the

outfalls will comply with the E. coli standard after the upgrades are placed in operation.

7.      Although the E. coli TMDL fails to provide the E. coli WLAs needed to enable

DC Water to comply with the NPDES Permit, the EPA Approval Documents acknowledge the

importance of providing the needed WLAs.  The reason why they have not been provided is not

stated in the EPA Approval Documents, but appears to be due, in part, to EPA's failure to require

the DC Department of the Environment to account for known significant daily variations in

---

[2] "MPN" stands for "Most Probable Number," which is a statistical estimate of the number of E. coli colonies likely
to be found in 100 milliliters of water.

discharge and instream E. coli concentrations and the corresponding 30-day geometric mean E. coli water quality standard when calculating the maximum daily WLAs for Outfalls 002 and 001.

8.      Lawful TMDLs under the CWA are based on state or federally-enacted water quality standards.  For CWA purposes the District of Columbia is a state.  Its relevant E. coli water quality standard was enacted as Title 21 of the District of Columbia Municipal Regulations ("DCMR") § 1104.8 (Table 1).  The standard does not require that the samples be taken on particular days; only that that there be a minimum of 5 samples and that they be taken over a period not to exceed 30 days.  Expressing the 126 MPN/100 ml E. coli water quality standard as a "Geometric Mean (Maximum 30 day geometric mean for 5 samples)" allows maximum daily E. coli concentrations to exceed 126 MPN/100 ml without violating the standard so long as the geometric mean of at least 5 samples does not exceed 126 MPN/100 ml over a 30-day period. The maximum daily WLAs for Outfall 002 approved by EPA in the E. coli TMDL erroneously assume that the maximum daily E. coli concentrations in the discharges from this outfall cannot exceed 126 MPN/100 ml and still comply with the standard.

9.      DC Water's comments on two versions of the draft E. coli TMDL repeatedly emphasized the importance of accounting for the daily variations in E. coli concentrations and the corresponding 30-day geometric mean E. coli standard when calculating the maximum daily WLAs for Outfalls 002 and 001. DC Water's comments also presented historical data which clearly showed these daily variations and demonstrated that daily E. coli concentrations could exceed 126 MPN/100 ml by a wide margin without violating the standard.  Further, DC Water's comments offered alternative approaches for calculating the maximum daily WLAs for Outfalls 002 and 001, and predicted that calculating WLAs without using one of these approaches would significantly under-allocate the Potomac River's available E. coli load capacity and not provide

4

the E. coli WLAs needed to enable DC Water to comply with the NPDES Permit. EPA's failure to follow any of the offered approaches resulted in the consequences predicted in DC Water's comments.

10.     Whether by oversight or design, in approving the E. coli TMDL despite the fact that it failed to include the maximum daily WLAs as provided by law and as needed to enable DC Water to comply with the NPDES Permit, EPA has needlessly put hundreds of millions of dollars of public expenditures at risk because the NPDES permit must be consistent with the requirements and assumptions of the WLAs.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. §§ 1331 because the claims arise under the laws of the United States, and pursuant to the Administrative Procedure Act, which provides for judicial review of final agency action.   This Court can grant declaratory judgment and injunctive relief pursuant to 28 U.S.C § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and pursuant to 5 U.S.C. §§ 553, 701-706 for violations of the Administrative Procedure Act ("APA").

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (e) because Defendant EPA is an agency of the United States, and Plaintiff DC Water has its principal place of business in the District of Columbia.

## PARTIES

13.     Plaintiff DC Water is an independent authority of the DC Government.  DC Water was created in 1996 by the DC Government to provide drinking water distribution to residents of the District of Columbia and regional wastewater collection and treatment to citizens and businesses in the metropolitan Washington, D.C. area.  DC Water operates Blue Plains, which is

authorized to discharge treated wastewater to the Potomac River pursuant to the NPDES Permit. Blue Plains serves approximately 1.6 million people in the metropolitan Washington, D.C. area, and treats all of the wastewater generated in the District of Columbia as well as portions of suburban Montgomery County and Prince George's County in Maryland; Fairfax County and Loudoun County in Virginia; and the Town of Vienna in Virginia.

14.     DC Water is also responsible for operating and maintaining the District of Columbia's combined sewer system (the "CSS") which conveys both sanitary wastewater and storm water in a single pipe.  The CSS dates to the nineteenth century, serves the central, older portions of the District of Columbia, and covers about 20 square miles.  When the capacity of the CSS is exceeded during storms, the excess flow of combined sanitary wastewater and storm water is discharged to the Potomac and Anacostia Rivers and Rock Creek through combined sewer overflow ("CSO") outfalls.

15.     Defendant EPA is the federal agency charged with administration and enforcement of the Act in accordance with delegations of authority from Congress.

16.     Although not a party to this suit, the DC Government is responsible for administering the District of Columbia's environmental programs through the DC Department of the Environment ("DDOE").  Among the environmental regulatory programs administered by DDOE are the adoption of the water quality standards required by CWA Section 303, 33 U.S.C § 1313 (which must be approved by EPA) and certifications of compliance with water quality standards by federally authorized discharges pursuant to CWA Section 401, 33 U.S.C. § 1341. Discharges from Blue Plains and the District of Columbia's combined sewer system are among the federally authorized discharges for which DDOE must issue water quality certifications pursuant to CWA Section 401.  Under the CWA, DDOE serves the same role in protecting the

quality of the District of Columbia's waters as the role served by state water quality agencies, although unlike most state water quality agencies, DDOE is not authorized to administer the NPDES program in the District of Columbia.  Consequently, EPA, not DDOE, issues and enforces the NPDES permit issued for Blue Plains and the District of Columbia's sewer system.

## LEGAL AND FACTUAL BACKGROUND

### The District's Fecal Coliform Standard

17.     Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA § 101(a), 33 U.S.C. § 1251(a).  To achieve this goal, Section 303 of the Act requires each state, including the District of Columbia, to establish and implement water quality standards, subject to review and approval by EPA.  CWA § 303(a)-(c), 33 U.S.C. § 1313(a)-(c).  Water quality standards include the "designated uses" of a state's waters and "the water quality criteria for such waters based upon such uses."  CWA § 303(c)(2)(A), 33 U.S.C. § 1313(c)(2)(A); *see also* 40 C.F.R. § 130.2(d).

18.     Pursuant to Section 303 of the CWA, the DC Government by and through its Department of Health ("DOH") adopted water quality standards for the District of Columbia's waters in 1994.  41 D.C. Reg. 1075 (Mar. 4, 1994).  These standards designated all of the District of Columbia's waters, with the exception of wetlands, for multiple uses, including primary contact recreation.  21 DCMR § 1101.1, .2 & Tables.  To protect the primary contact recreation designated use, DOH's water quality standards also included an EPA-recommended ambient numeric bacteria criterion of 200 MPN fecal coliform colonies per 100 ml of water as the indicator organism for bacteriological contamination. The standards based compliance with this

criterion on a maximum 30-day geometric mean concentration.  *Id*. § 1104.8 (Table 1).  EPA

approved this criterion following its adoption by DOH.[3]

### The Potomac River Impaired Waters Listing for Bacteria Based on the Fecal Coliform Standard

19.     The CWA also requires each State, including the District of Columbia, to

"identify those waters within its boundaries for which the [technology-based] effluent limitations

required by section 1311(b)(1)(A) and section 1311(b)(1)(B) of this title [CWA §

303(b)(1)(A)&(B)] are not stringent enough to implement any water quality standard applicable

to such waters."  CWA § 303(d)(1)(A), 33 U.S.C. § 1313(d)(l)(A). Waters so identified are

referred to as "impaired" waters.

20.     In 1996, DOH listed the Potomac River as impaired based on data which

indicated exceedances of the fecal coliform standard due principally to wet-weather driven

discharges, including municipal storm water, CSO discharges from the District of Columbia's

combined sewer system, and non-point source runoff.

### DC Water's Long-Term CSO Control Plan

21.     Soon after it was created in 1996, DC Water began development of the Long-

Term CSO Control Plan ("LTCP") required by EPA's 1994 CSO Control Policy.[4]  Through the

development and implementation of the LTCP, DC Water planned to address, among other

things, the combined sewer system as one of the sources of the 1996 impaired waters listing for

bacteria by controlling discharges from the CSOs to prevent them from causing or contributing

to a violation of applicable water quality standards in the receiving waters.  In 2002, following

over four years of data collection, modeling, engineering, planning, and public participation, DC

---

[3] The numeric criteria for fecal coliform and E. coli are hereafter referred to as the "fecal coliform standard" and the "E. coli standard," respectively.
[4] 59 Fed. Reg. 18,688 (Apr. 19, 1994). The Policy is codified in Section 402(q) of the CWA, 33 U.S.C. § 1342(q).

Water completed its LTCP Final Report and submitted it to EPA and DOH for their review and approval.  After completion, the CSO control projects specified in the LTCP will reduce system-wide CSO discharges by 96% in the average rainfall year.

22.    The LTCP, which has a current total estimated cost of $2.6 billion, includes an extensive underground tunnel system to capture excess CSS flow and convey it to Blue Plains for treatment.   The LTCP also provides for hundreds of millions of dollars in upgrades to Blue Plains to improve the reliability of the Plant to treat the peak, high-rate, captured combined sewer system flows conveyed from the tunnel system to Blue Plains while also achieving the level of treatment required to comply with the water quality standard for bacteria expressed not only as fecal coliform, but also as E. coli.

23.    The modeling for compliance with the fecal coliform and E. coli standards conducted by DC Water during development of the LTCP used predicted peak flows from Blue Plains and the CSS and event mean concentrations[5] of fecal coliform and E. coli to determine compliance with the 30-day geometric mean standard.

24.    The modeling used to develop the LTCP *did not* evaluate the maximum daily concentrations of fecal coliform and E. coli that could be discharged from Blue Plains without exceeding the standards because both standards (fecal coliform and E. coli) were expressed as 30-day geometric means, *not as* daily maximums.

25.    Following their review and evaluation of the LTCP, EPA and DOH concluded in 2004 that implementation of the control projects in the LTCP would prevent the combined sewer system and Blue Plains from causing or contributing to a violation of water quality standards

---

[5] The "event mean concentration" or "EMC" is the "total mass of a pollutant discharged during an event divided by the total discharge volume." U.S. EPA Office of Water, *Combined Sewer Overflows Guidance For Monitoring And Modeling* at 7-11, Publ'n No. EPA 832-B-99-002 (Jan. 1999).

(including the existing fecal coliform standard and the soon-to-be-adopted E. coli standard).

EPA and DOH's standards compliance determinations included both agencies' findings that

implementation of the LTCP would comply with the WLA for Blue Plains in the 2004 fecal

coliform TMDL discussed below.

**Modifications to the NPDES Permit Based on the Approved LTCP and
Standards Compliance Determinations**

26.     EPA modified the NPDES Permit in 2003 and again in 2004 to add water quality-

based effluent limitations and performance standards for the combined sewer system as well as

the following flow and treatment requirements for Blue Plains Outfalls 002 and 001 based on the

approved LTCP and standards compliance determinations by EPA and DOH[6]:

     a.   Outfall 002 (Complete Treatment) – Provide complete treatment for flows up to

        740 million gallons per day ("mgd") for the first four hours after the start of a

        Combined Sewer System Flow Condition and complete treatment for flows up to

        511 mgd for four hours thereafter until the Combined Sewer System Flow

        Condition ends.[7]

     b.   Outfall 001 (Wet Weather Treatment) – During times when the Plant's complete

        treatment capacity is exceeded, provide wet weather treatment using primary

        treatment, disinfection and dechlorination for flows of 336 mgd or less.

27.     The 2004 permit modification included a fecal coliform limit for Outfall 002

expressed as the standard (200 MPN/100 ml maximum geometric mean), but did not include

---

[6] Blue Plains is designed to provide advanced wastewater treatment (complete treatment) and, when wet weather
flows exceed the capacity of the complete treatment system during Combined Sewer System Flow Conditions,
excess flow treatment.  Flows receiving complete treatment are discharged from Outfall 002 and flows receiving wet
weather treatment are discharged from Outfall 001.

[7] The permit defines the "Combined Sewer System Flow" Condition to mean the condition that begins when the
influent flow to receive complete treatment at Blue Plains is greater than 511 mgd. The Combined Sewer System
Flow Condition is "deemed to cease 4 hours after the [i]nfluent [f]low rate drops to a rate less than 511 mgd or a
period of 4 hours has lapsed since the start of the [Combined Sewer System Flow Conditions], whichever occurs
later." *See* 2010 Permit, Part I.A.4; 2004 Permit at Part I.B.

either a maximum daily fecal coliform limit for Outfall 002 or a fecal coliform limit for Outfall

001. DC Water did not object to the NPDES Permit as modified in 2004 because the above-

described limitations, performance standards, and flow and treatment requirements were

consistent with the approved LTCP and the average annual WLA for Blue Plains in the fecal

coliform TMDL, which had been adopted by DOH and approved by EPA earlier in 2004.

28.     DC Water began implementing the LTCP (including the upgrades to Blue Plains)

in 2005 pursuant to a federal consent decree with EPA and the DC Government. The consent

decree requires that all of the CSO control projects in the LTCP be completed no later than

March 2025.[8]

### The 2004 Fecal Coliform TMDL for the Potomac River

29.     The CWA also requires that for the waters identified as impaired, "[e]ach State

[including the District of Columbia] shall establish . . . the total maximum daily load, for those

pollutants which the Administrator identifies under section 1314(a)(2) of this title as suitable for

such calculation."  CWA § 303(d)(l)(C), 33 U.S.C. § 1313(d)(l)(C).  The Act requires that

"TMDLs shall be established for all pollutants preventing or expected to prevent attainment of

water quality standards ...."  40 C.F.R. § 130.7(c)(l)(ii); *see also* CWA § 303(d), 33 U.S.C. §

1313(d).  The CWA further provides that TMDLs "shall be established at a level necessary to

implement the applicable water quality standards with seasonal variations and a margin of safety

which takes into account any lack of knowledge concerning the relationship between effluent

limitations and water quality."  CWA § 303(d)(1)(C), 33 U.S.C. § 1313(d)(1)(C). Submission of

---

[8] DC Water, EPA, and the DC Government have agreed to propose amendments to the decree to substitute green
infrastructure (i.e., rain gardens, green roofs, etc.) for much of the gray infrastructure (i.e., tunnels, pumping station,
etc.) now required for the Potomac River and Rock Creek sewersheds and to extend the schedules for completing the
Potomac River and Rock Creek sewershed projects from March 2025 to March 2030.  The proposed amendments
were lodged with this Court on May 19, 2015 and have been noticed for public comment.  *Anacostia Watershed
Society v. D.C. WASA*, Civ. A. No. 1:00-cv-00183 TFH, ECF No. 115-1. The March 2018 and March 2025
deadlines for completing the Blue Plains upgrades and Anacostia River projects, respectively, are not affected by the
proposed amendments.

lists of impaired waters and related TMDLs by states and the District of Columbia trigger a duty of EPA to "either approve or disapprove such identification and load not later than thirty days after the date of submission." CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2).

30.     In 2004, DOH adopted a bacteria TMDL for the Potomac River and its tributaries using the District's 200 MPN/100 ml (maximum 30-day geometric mean concentration) standard for Class A waters (primary contact recreation) as the end point for the TMDL.  EPA approved the fecal coliform TMDL later that same year.   The fecal coliform TMDL contained average annual WLAs, *but not* maximum daily WLAs.[9]  DC Water did not object to this TMDL because it contained an average annual WLA for Blue Plains that provided the fecal coliform allocation required to enable DC Water to comply with the effluent limitations and flow and treatment requirements in the NPDES permit.

31.     Since wet-weather driven discharges (municipal storm water, CSOs, and non-point source runoff) are the dominant sources of bacteria in the District's segment of the Potomac River, bacteria counts in this segment can vary significantly from day to day depending on the volume, intensity, and duration of rainfall in the watershed.  In order to account for these variations in the fecal coliform TMDL and apply them to the geometric mean fecal coliform standard, DOH and EPA analyzed rainfall data over a period of 50 years and used the same model calibrated by DC Water during development of the LTCP to determine the average annual load reductions required of the various sources of bacteria to meet the District's 30-day geometric mean fecal coliform standard.

---

[9] Under EPA's regulations, a TMDL is "[t]he sum of the individual [waste load allocations or "WLAs"] for point sources and [load allocations or "LAs"] for nonpoint sources and natural background.  40 C.F.R. § 130.2(i).  A WLA is "[t]he portion of a receiving water's loading capacity that is allocated to one of its exiting or future point sources of pollution." *Id.* § 130.2(h).

32.     Like the modeling conducted by DC Water to develop the LTCP, the modeling

conducted to develop the fecal coliform TMDL used predicted peak flows from Blue Plains and

the CSS and event mean concentrations for fecal coliform to determine compliance with the 30-

day geometric mean fecal coliform standard and to establish the average annual fecal coliform

WLAs required to implement the standard.  Also, like the LTCP, modeling *was not* conducted

during development of the fecal coliform TMDL to determine the maximum daily fecal coliform

load that can be discharged without exceeding the 30-day geometric mean standard.  This is

because the fecal coliform TMDL, unlike the E. coli TMDL challenged in this suit, did not

contain maximum daily WLAs.

33.     Among the WLAs in the fecal coliform TMDL was an aggregated average annual

WLA for the total fecal coliform load discharged from Blue Plains Outfalls 001 and 002.  Both

outfalls are critical elements of DC Water's LTCP because they are the discharge points for the

hundreds of millions of gallons of captured combined sewer flow that must be conveyed to and

treated at Blue Plains during storm events now and in the future.  The extensive data analysis and

modeling used by DOH and EPA to develop the fecal coliform TMDL produced an average

annual Blue Plains WLA that not only provided for compliance with the District's 30-day

geometric mean fecal coliform standard, but also allocated an annual waste load to Blue Plains

that DC Water could comply with following completion of the upgrades to Blue Plains in March

2018.

**The District's E. coli Standard**

34.     In 2005, DOH revised the District of Columbia's water quality standards to

change the standard for bacteria from a 30-day geometric mean of 200 MPN/100 ml fecal

coliform to a 30-day geometric mean of 126 MPN/100 E. coli. 52 D.C. Reg. 9621, 9628-29 (Oct. 28, 2005); *see also* 21 DCMR § 1104.8.  This change was subsequently approved by EPA.

35.     The change from a fecal coliform standard to an E. coli standard was based on EPA's 2003 guidance,[10] which was an update of EPA's 1986 guidance.[11]   In its 2003 guidance EPA recommended that the states base their bacteria standards on E. coli rather than fecal coliform because the science developed since 1986 indicated that E. coli provided a better correlation between swimming-associated illnesses and concentrations of bacteria.  The 2003 guidance was not intended to change the risk assessment or scientific basis for the standard nor was it intended to impose more stringent requirements for the reduction of bacteria.

**The 2010 Blue Plains NPDES Permit**

36.     In 2010, EPA reissued the NPDES Permit. The reissued NPDES Permit substituted E. coli for fecal coliform as the indicator for bacteria and included an E. coli limit for Outfall 002 expressed as the standard (126 MPN/100 ml maximum geometric mean for 5 samples minimum), but did not include either a maximum daily E. coli limit for Outfall 002 or an E. coli limit for Outfall 001.  DC Water did not object to the effluent limitation for E. coli in the reissued NPDES Permit because it simply substituted E. coli for fecal coliform as the indicator for bacteria.  It was not more stringent than the effluent limitation for fecal coliform in the NPDES Permit as modified in 2004, and therefore, was consistent with the approved LTCP and the average annual WLA for Blue Plains in the fecal coliform TMDL adopted and approved in 2004.

---

[10] U.S. EPA Office of Water, *Implementation Guidance for Ambient Water Quality Criteria for Bacteria*, Publ'n No. EPA-823-B-03-xxx (Nov. 2003 Draft).
[11] U.S. EPA Office of Water, *Ambient Water Quality Criteria for Bacteria – 1986*, Publ'n No. EPA 440/5-84-002 (Jan. 1, 1986).

37.     The reissued NPDES Permit also modified the water quality-based flow and treatment requirements for Outfalls 002 and 001 to reflect modifications to the LTCP that were required to enable DC Water to comply with a new, more stringent effluent limitation for total nitrogen while also complying with its CSO control performance standards.  The modified flow and treatment requirements are as follows:

a.   Outfall 002 (Complete Treatment) – provide complete treatment for flows up to 555 million gallons per day ("mgd") for the first four hours after the start of a Combined Sewer System Flow Condition and complete treatment for flows up to 511 mgd for four hours thereafter until the Combined Sewer System Flow Condition ends.[12]

b.   Outfall 001 (Wet Weather Treatment) – During times when the Plant's complete treatment capacity is exceeded, provide wet weather treatment using enhanced clarification for flows up to 225 mgd.

38.     In reissuing the NPDES Permit, EPA found that the permit's water quality-based effluent limitations, CSO control performance standards, and flow and treatment requirements would prevent discharges from Blue Plains from causing or contributing to a violation of the water quality standard for E. coli in the receiving water.  DDOE[13] concurred in this finding when it certified that the permit would comply with the standard.

---

[12] The reissued permit did not change the definition of "Combined Sewer System Flow" Conditions.
[13] DDOE assumed responsibility for the DC Government's environmental programs from DOH at the time DDOE was created by the DC Government in 2006.  District of Columbia Office of the Mayor, Mayor's Order 2006-61 (June 14, 2006).

## THE 2014 E. COLI TMDL FOR THE POTOMAC RIVER

39.     The E. coli TMDL approved by EPA on December 31, 2014, followed two earlier draft versions of the E. coli TMDL proposed by DDOE, both of which were noticed for public comment.

### The February 8, 2013 Draft E. coli TMDL

40.     The first version of the draft TMDL, which was noticed for public comment on February 8, 2013, contained one average annual WLA and one maximum daily WLA for Blue Plains.  Each WLA was expressed as a mass load rather than a concentration.  The WLAs did not allocate loads between Outfalls 001 and 002.  DDOE used a statistical multiplier rather than modeling to calculate the maximum daily WLA and its calculations failed to account for all of the flows the NPDES Permit requires DC Water to treat.

41.     DC Water's March 22, 2013, comments on this version of the draft TMDL explained that use of the statistical multiplier and incorrect flows resulted in a proposed maximum daily Blue Plains WLA that not only substantially under-allocated the maximum daily E. coli load that can be discharged from Blue Plains without exceeding the E. coli water quality standard, but also did not provide the E. coli WLAs that would enable DC Water to comply with the NPDES Permit.  In its comments, DC Water explained that the correct way to develop a maximum daily WLA based on the District's 30-day geometric mean standard is to perform modeling using historical daily flow and concentration data to determine the maximum daily loads that could be discharged from the Plant without exceeding the standard.  DC Water's comments also pointed out that DDOE's failure to use modeling to develop the maximum daily WLA meant that the WLA did not account for the fact that the E. coli water quality standard is written as a 30-day geometric mean to allow for the sporadic large daily variations in E. coli

16

concentrations commonly associated with storm events. To illustrate this point, DC Water's comments presented historical Blue Plains discharge data and calculations which demonstrated that the Plant's discharges could periodically contain daily E. coli concentrations far greater than 126 MPN/100 ml and still comply with the standard. *See* DC Water July 23, 2104 Comments, attached without exhibits as Exhibit D.

### The May 30, 2014 Draft E. coli TMDL

42.     Rather than modifying the first version of the TMDL in response to comments, DDOE issued a second version of the draft TMDL, which was noticed on May 30, 2014.  The second version simply incorporated the E. coli 30-day geometric mean water quality standard as the average annual and maximum daily WLAs for Blue Plains, and therefore, was completely different from the first version.

43.     DC Water's July 23, 2014, comments on the second version pointed out that simply expressing a WLA as the water quality standard failed to satisfy the CWA's minimum TMDL requirements, and again explained that, like the fecal coliform standard, the E. coli standard is written as a 30-day geometric mean to account for the sporadic large daily variations in effluent and instream E. coli concentrations commonly associated with storm events. *See* Exhibit E.  Accordingly, as explained in the comments, the correct way to develop a maximum daily WLA for a standard expressed as a 30-day geometric mean is to conduct modeling using historical flow and concentration data to determine the maximum daily loads that can be discharged from the Plant without exceeding the standard.   DC Water's comments explained again that failure to perform this analysis and run the geometric mean calculation can lead to a maximum daily WLA that could not only under-allocate the maximum daily E. coli load that can

be discharged from Blue Plains without exceeding the E. coli standard, but fail to provide the maximum daily E. coli WLAs that would enable DC Water to comply with the NPDES Permit.

44.     In response to EPA and DDOE's expressed opposition to devoting the time and resources required to conduct the modeling and analysis needed to correctly calculate maximum daily WLAs, DC Water's comments on each version of the draft TMDL proposed alternative, less resource-intensive approaches to calculating the maximum daily WLAs that would still under-allocate the maximum daily E. coli load that can be discharged from Blue Plains without exceeding the E. coli standard, but at least provide the maximum daily E. coli WLAs that would enable DC Water to comply with the NPDES Permit.

**The E. coli TMDL Approved by EPA**

45.     <u>Average Annual Blue Plains WLAs</u> – The E. coli TMDL establishes separate average annual WLAs for Outfalls 002 and 001 without conducting any new modeling.  Instead, DDOE relied on modeling conducted to develop the average annual WLAs for the 2004 fecal coliform TMDL and used the E. coli data collected by DC Water to translate the fecal coliform loads to E. coli loads.  DC Water has no objection to the approach used to develop the average annual WLAs or the average annual WLAs themselves because the approach is based upon the underlying modeling used to develop the 2004 fecal coliform TMDL, has a technically sound basis, and the resulting average annual WLAs are sufficient to enable DC Water to comply with any limitations and requirements included in the NPDES Permit based on the average annual WLAs.

46.     <u>Maximum Daily Blue Plains WLAs</u> – The TMDL establishes separate maximum daily WLAs for Outfalls 002 and 001, including separate wet weather and dry weather WLAs expressed as mass loads for each outfall.  The EPA Approval Documents state that the WLAs

were based on output from the model used to develop DC Water's LTCP and the following

permitted discharge flows and E. coli concentrations:

a.  The *wet weather WLA for Outfall 002* (applies when Combined Sewer System

Flow Conditions are in effect) was calculated based on the permitted wet weather

discharge flow from Outfall 002 (i.e., 555 mgd for the first 4 hrs. and 511 mgd for

20 hrs. thereafter) and an E. coli concentration of 126 MPN/100 ml as a daily

maximum.

b.  The *dry weather WLA for Outfall 002* (applies when Combined Sewer System

Flow Conditions are not in effect) was calculated based on Blue Plains' permitted

annual average complete treatment design flow capacity of 370 mgd and an E.

coli concentration of 126 MPN/100 ml as a daily maximum.

c.  The *wet weather WLA for Outfall 001*[14] (applies when Combined Sewer System

Flow Conditions are in effect) was calculated based on the permitted 225 mgd wet

weather flow for Outfall 001 and the E. coli event mean concentration for this

outfall from data used to develop the LTCP.

**The Final Maximum Daily WLAs for Blue Plains were not a Logical Outgrowth of the
Notices**

47.  EPA approved DDOE's TMDL notice and publication process when it approved

the TMDL.[15]

48.  The first draft TMDL notice proposed one maximum daily E. coli WLA for Blue

Plains using a statistical multiplier to convert the proposed average annual WLA to a maximum

daily WLA, while the second draft TMDL notice proposed to simply incorporate the E. coli

---

[14] The dry weather WLA for Outfall 001 is zero because the NPDES Permit prohibits discharges from this outfall
during dry weather conditions.
[15] *See* EPA December 31, 2014 Decision Rationale at 9-10 ("Decision Rationale") (Exhibit B).

water quality standard as separate maximum daily E. coli WLAs for Outfalls 002 and 001.

Neither of these notices gave any indication that EPA and DDOE were considering adopting

separate dry weather and wet weather WLAs for each outfall, or using (i) the E. coli water

quality standard as a maximum daily standard, (ii) the output from the LTCP model, (iii) the

Blue Plains average annual dry weather design flow capacity, or (iv) an E. coli event mean

concentration to calculate the WLAs.  As a consequence, the final maximum daily WLAs for

Outfalls 002 and 001 and the approaches used to calculate these are not a logical outgrowth of

the notices and deprived DC Water of notice and the opportunity to comment on the final WLAs,

the approaches used to calculate the WLAs, and the consequences of the WLAs for DC Water.

**Flaws in the Maximum Daily Waste Load Allocations for Blue Plains**

49.    The following flaws in the approaches used to calculate the maximum daily

WLAs resulted in allocations that not only substantially under-allocate the maximum daily E.

coli load that can be discharged from Blue Plains without exceeding the E. coli water quality

standard, but also fail to provide the E. coli WLAs that would enable DC Water to comply with

the NPDES Permit.  The E. coli TMDL is not designed or intended to reduce the bacteria loads

allocated in the 2004 fecal coliform TMDL or otherwise establish WLAs more stringent than

those established in the fecal coliform TMDL.  But the following errors in the inputs and

calculations used to develop the maximum daily E. coli WLAs for Outfalls 002 and 001 did, in

fact, result in E. coli WLAs significantly more stringent than those in the fecal coliform TMDL

relied on by DC Water to undertake hundreds of millions of dollars in upgrades to Blue Plains.

a.    *Use of Incorrect E. coli Standard.*   The maximum daily WLAs for Outfall 002

were calculated using the District's 30-day geometric mean E. coli water quality

standard as a daily maximum standard.  As a consequence, the calculations

produced maximum daily WLAs based on an E. coli concentration of 126 MPN/100 ml as a daily maximum rather than a 30-day geometric mean. This error contributed to the substantial under-allocation for Outfall 002.

b. *Use of Incorrect Model Output.* The maximum daily WLAs for Outfall 002 were calculated using the output from the modeling used to develop DC Water's LTCP. The modeling used to develop the LTCP *did not* evaluate the maximum daily concentrations of E. coli that can be discharged from Blue Plains without exceeding the standard.  Therefore, the output from such modeling cannot be used to calculate maximum daily WLAs based on the District's 30-day geometric mean E. coli standard.  This error contributed to the substantial under-allocation for Outfall 002.

c. *Use of Incorrect Plant Flow.* The maximum daily dry weather WLA for Outfall 002 was calculated using the Plant's 370 mgd average annual design flow. DDOE and EPA should have used a dry weather flow of 510 mgd to calculate the maximum daily dry weather WLA for Outfall 002 because this WLA applies when Combined Sewer System Flow Conditions are not in effect.  Combined Sewer System Flow Conditions are not in effect until Outfall 002 flows exceed 510 mgd.  This error contributed to the substantial under-allocation for Outfall 002.

d. *Use of Incorrect E. coli Concentration.*  The maximum daily wet weather WLA for Outfall 001 was calculated using the E. coli event mean concentration (EMC) from DC Water's LTCP.  An EMC is an event *mean* concentration, not an event *maximum* concentration, and therefore, does not reflect the maximum daily E. coli

concentration that can be discharged from Outfall 001. This error contributed to

the substantial under-allocation for Outfall 001.

**Responses to Comments**

50.     EPA approved DDOE's responses to DC Water's comments (the "Comment

Response" (Exhibit A)) on both versions of the draft TMDL when it approved the TMDL.[16]

51.     The Comment Response acknowledges the importance of providing maximum

daily E. coli WLAs needed to enable DC Water to comply with the NPDES Permit, but indicates

that EPA and DDOE mistakenly believed that they had achieved this objective by calculating the

WLAs using output from the LTCP model and the effluent flows and E. coli concentrations

described above.  These mistakes might have been corrected had DC Water been afforded the

opportunity to comment on the WLAs before they were finalized and approved by EPA.

52.     It is apparent from the Comment Response that EPA and DDOE used the output

from the LTCP model in the mistaken belief that the output provided the basis for calculating the

maximum daily WLAs because the LTCP demonstrated that the E. coli water quality standard

would be met instream after the CSO control projects in the LTCP are fully implemented.[17]

Although DDOE and EPA were correct in stating that the LTCP demonstrated compliance with

the E. coli standard, they erred in using the output from the LTCP model to calculate the

maximum daily WLAs because the modeling used to develop the LTCP did not evaluate the

maximum daily concentrations of E. coli that could be discharged from Blue Plains without

exceeding the standard.  The Comment Response also indicates that EPA and DDOE made the

same mistake in using the E. coli event mean concentration to calculate the maximum daily wet

weather WLA for Outfall 001.

---

[16] *Id.*
[17] *See, e.g.*, *id.* at 5.

**The Maximum Daily WLAs Will Have Serious Consequences for DC Water**

53.      It is highly probable that EPA will include the maximum daily WLAs for Outfalls

002 and 001 in the NPDES Permit as maximum daily effluent limits when the permit is

renewed.[18]  Historical effluent data for Outfall 002 indicates that Blue Plains' complete treatment

system cannot reliably and consistently comply with effluent limitations based on the maximum

daily WLAs for Outfall 002 while treating the flows required by the NPDES Permit. Further,

although hundreds of millions of dollars in upgrades are underway to enhance the performance

of the Blue Plains wet weather treatment train, the upgrades are not designed to consistently

achieve the level of performance required to comply with an effluent limitation based on the

maximum daily wet weather WLA for Outfall 001.

54.      DC Water's inability to comply with effluent limits based on the WLAs will

subject it to enforcement action and resulting monetary penalties and injunctive relief with no

benefit to water quality.

**Agency Action**

55.      Agency action must be held unlawful and set aside if found to be arbitrary,

capricious; an abuse of discretion; contrary to constitutional right, power, privilege, or immunity;

in excess of statutory jurisdiction authority, or limitations, or short of statutory right; without

observance of procedure required by law; in excess of statutory authority; or otherwise not in

accordance with law.  5 U.S.C. § 706(2)(A)-(D).

56.      To prevail under the standard of review in 5 U.S.C. § 706(2)(A) "an agency must

examine the relevant data and articulate a satisfactory explanation for its action including a

---

[18] This probability is based on EPA's regulations and EPA's December 31, 2014 Decision Rationale.  EPA regulations require that NPDES permits incorporate effluent limits "consistent with the assumptions and requirements of any available wasteload allocation for the discharge."  40 C.F.R. § 122.44(d)(1)(vii)(B).  EPA's Decision Rationale states that "[i]t is an assumption and requirement of the [TMDL] that both the annual and daily loads must be achieved in order to ensure that the applicable water quality standards will be met."  *See* Decision Rationale at 2 (Exhibit B).

rational connection between the facts found and the choice made." *Del. Dep't Natural Resources & Envtl. Control v. EPA*, 785 F.3d 1, 11 (D.C. Cir. 2015) (citations omitted).

## CLAIMS FOR RELIEF

### FIRST CLAIM
**The TMDL and Its Approval by EPA Violates the CWA and Exceeds EPA's Statutory Authority Because the Maximum Daily E. coli WLAs for Outfall 002 Were Calculated Using the District's 30-day Geometric Mean E. coli Standard as a Daily Maximum E. Coli Standard**

57.     All preceding paragraphs of this Complaint are incorporated and re-alleged as if fully set forth in this first claim.

58.     Pursuant to the CWA and implementing regulations, a TMDL must be established at a level necessary to implement the "applicable water quality standards."  CWA § 303(d)(1)(C), 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7(c)(1) & (d)(2).

59.     EPA violated CWA § 303(d)(1)(C) and its implementing regulations, exceeded its statutory authority, and otherwise violated 5 U.S.C. § 706(2)(A) – (D) by approving the E. coli TMDL because the maximum daily WLAs for Outfall 002 were calculated using the District's 30-day geometric mean E. coli water quality standard as a maximum daily standard, and therefore, did not implement the applicable water quality standard.

### SECOND CLAIM
**EPA Acted Arbitrarily and Capriciously, Abused Its Discretion, and Otherwise Acted Contrary to Law When It Approved the E. coli TMDL Because the Maximum Daily Dry Weather E. coli WLA for Outfall 002 Was Calculated Using the Wrong Flow**

60.     All preceding paragraphs of this Complaint are incorporated by reference and re-alleged as if fully set forth in this second claim.

61.     The E. coli TMDL included a maximum daily dry weather WLA for Outfall 002 that was calculated using Blue Plains' average annual design flow of 370 mgd instead of 510

mgd, which is the maximum dry weather flow that DC Water is required to treat and discharge from Outfall 002.

62.     There is no rational connection between the Plant's average annual design flow and the maximum daily dry weather WLA for Outfall 002 because the maximum daily dry weather WLA is intended to reflect the Plant's maximum daily dry weather flow from Outfall 002, not the Plant's smaller average annual design flow.  Further, it is clear from the EPA Approval Documents that EPA did not even consider using the Plant's maximum daily dry weather flow in calculating the maximum daily dry weather WLA for Outfall 002, much less explain why it used the Plant's average annual design flow instead of the Plant's maximum daily dry weather flow.

63.     EPA acted arbitrarily and capriciously, abused its discretion, and otherwise acted not in accordance with law in approving the E. coli TMDL because there is no rational connection between the flow used to calculate the maximum daily dry weather WLA for Outfall 002 and a maximum daily dry weather WLA, and because EPA failed to consider use of the maximum daily dry weather flow or to explain why the maximum daily flow was not used in the calculations.

**THIRD CLAIM**
**EPA Acted Arbitrarily and Capriciously, Abused Its Discretion, and Otherwise Acted Not in Accordance with Law When It Approved the E. coli TMDL Because the Maximum Daily Wet Weather E. coli WLA for Outfall 001 Was Calculated Using the Wrong E. coli Concentration**

64.     All preceding paragraphs of this Complaint are incorporated by reference and re-alleged as if fully set forth in this third claim.

65.     The E. coli TMDL included a maximum daily wet weather WLA for Outfall 001 that was calculated using an E. coli event mean concentration for Outfall 001 instead of the Plant's larger maximum daily E. coli concentration for this outfall.

66.     There is no rational connection between the E. coli event mean concentration for Outfall 001 and the maximum daily wet weather WLA for Outfall 001 because the maximum daily wet weather WLA is intended to reflect the larger maximum daily wet weather E. coli concentration from Outfall 001, not the smaller event mean concentration.  Further, it is clear from the EPA Approval Documents that EPA did not even consider using the maximum daily wet weather E. coli concentration in calculating the maximum daily wet weather WLA for Outfall 001, much less explain why it used an E. coli event mean concentration instead of the maximum daily E. coli concentration.

67.     EPA acted arbitrarily and capriciously, abused its discretion, and otherwise acted not in accordance with law in approving the E. coli TMDL because there is no rational connection between the E. coli concentration used to calculate the maximum daily wet weather WLA for Outfall 001 and a maximum daily wet weather WLA, and because EPA failed to consider use of the maximum daily E. coli concentration or explain why the maximum daily E. coli concentration was not used in the calculations.

**FOURTH CLAIM**
**The E. coli TMDL and Its Approval by EPA Violates the CWA and Exceeds EPA's Statutory Authority Because the Maximum Daily E. coli WLAs for Outfalls 002 and 001 Do Not Allocate the Maximum Daily Load That Can Be Discharged from These Outfalls Without Violating the E. coli Standard**

68.     All preceding paragraphs of this Complaint are incorporated by reference and re-alleged as if fully set forth in this fourth claim.

69.     Pursuant to the CWA and implementing regulations, a TMDL must establish the total maximum daily load "at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety."  CWA § 303(d)(1)(C), 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7(c)(1) & (d)(2).

70.     The E. coli TMDL substantially under-allocates the maximum daily E. coli loads that can be discharged from Outfalls 002 and 001 without exceeding the E. coli standard with seasonal variations and a margin of safety.

71.     EPA violated CWA § 303(d)(1)(C) and its implementing regulations, exceeded its statutory authority, and otherwise violated 5 U.S.C. § 706(2)(A) – (D), in approving the TMDL because the maximum daily WLAs for Outfalls 002 and 001 substantially under-allocate the maximum daily E. coli loads that can be discharged from Outfalls 002 and 001 without exceeding the E. coli standard with seasonal variations and a margin of safety, and therefore, does not allocate the maximum daily load at a level necessary to implement the applicable water quality standard.

**FIFTH CLAIM**
**EPA Acted Arbitrarily and Capriciously and Otherwise Acted Not in Accordance with Law in Approving the E. coli TMDL Because It Failed to Allocate All of the Available E. coli Loading Capacity to Blue Plains While Also Failing to Provide the Maximum Daily WLAs that Would Enable DC Water to Comply with the NPDES Permit**

72.     The preceding paragraphs are incorporated by reference and re-alleged as if fully set forth in this fifth claim.

73.     Even assuming that EPA did not act in excess of its authority in approving the E. coli TMDL because the maximum daily WLAs for Blue Plains substantially under-allocate the maximum daily E. coli loads that can be discharged from Outfalls 002 and 001 without exceeding the E. coli standard, EPA acted arbitrarily and capriciously, abused its discretion, and

otherwise violated 5 U.S.C. § 706(2)(A) – (D), in approving the E. coli TMDL because the EPA

Approval Documents show that DDOE and EPA intended to allocate E. coli loads to Outfalls

002 and 001 sufficient to enable DC Water to comply with the NPDES Permit, but failed to do

so due to errors in the WLA calculations.  Thus, there is no rational connection between the

intended allocations in the maximum daily WLAs for Outfalls 002 and 001 and the WLAs that

were actually established in the E. coli TMDL.

**SIXTH CLAIM**
**EPA Acted Arbitrarily and Capriciously, Abused Its Discretion, and Otherwise Acted**
**Contrary to Law When It Approved the E. coli TMDL Because the EPA Approval**
**Documents Do Not Articulate a Rational Explanation for the Maximum Daily WLAs**
**for Outfalls 002 and 001**

74.     All preceding paragraphs of this Complaint are incorporated by reference and re-

alleged as if fully set forth in this sixth claim.

75.     The record shows that (i) EPA imposed water quality-based effluent limitations,

performance standards, and flow and treatment requirements in the NPDES Permit; (ii) these

permit limitations, standards, and requirements were based on prior determinations by EPA,

DOH, and DDOE that the discharges from Outfalls 002 and 001 would comply with the E. coli

standard for the Potomac River after the upgrades to Blue Plains were placed in operation in

March 2018; (iii) EPA knew that DC Water was spending hundreds of millions of dollars in

upgrades to Blue Plains to comply with the limitations, standards, and requirements in the

NPDES Permit; and (iv) EPA knew that maximum daily E. coli WLAs sufficient to enable DC

Water to comply with the NPDES Permit could be assigned to Outfalls 002 and 001 without

exceeding the E. coli standard.

76.     Notwithstanding these facts, EPA approved the E. coli TMDL even though it

included maximum daily WLAs for Outfalls 002 and 001 that significantly under-allocate the

maximum daily E. coli load that can be discharged from these outfalls without exceeding the E. coli standard and failed to provide the maximum daily WLAs for these outfalls that would enable DC Water to comply with the NPDES Permit.  EPA failed to articulate a rational connection between the above listed facts and its decision to not allocate the available E. coli loading capacity to Outfalls 002 and 001.

77.     Having failed to articulate a rational connection between the facts found and the choice made,  EPA's approval of the E. coli TMDL must be found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

78.     Agency action cannot be regarded as rational unless the agency also considered "significant alternatives to the course it ultimately chooses."  *Id.* (quoting *Allied Local & Reg'l Mfrs. Caucus v. U.S. EPA,* 215 F.3d 61, 80 (D.C. Cir. 2000)).

79.     DC Water's comments on the draft versions of the Blue Plains WLAs offered three alternative approaches for calculating maximum daily WLAs that would allocate most, if not all of the E. coli load that could be discharged from Blue Plains without exceeding the E. coli standard and also provide the maximum daily WLAs that DC Water must have in order to comply with the NPDES Permit.  The EPA Approval Documents show that EPA approved the E. coli TMDL even though DDOE either did not consider or summarily rejected the alternative approaches offered by DC Water.

80.     EPA acted arbitrarily and capriciously, abused its discretion, and otherwise acted not in accordance with law when it approved the E. coli TMDL because significant alternative approaches to those used to calculate the maximum daily WLAs for Outfalls 002 and 001 were offered, but the alternative approaches offered by DC Water either were not considered or were summarily rejected.

**SEVENTH CLAIM**
**The E. coli TMDL Is Unlawful Because DC Water Was Not Given Adequate Notice and**
**Opportunity to Comment on the Blue Plains WLAs**

81.     All preceding paragraphs of this Complaint are incorporated by reference and re-

alleged as if fully set forth in this seventh claim.

82.     Agency action must be held unlawful and set aside if taken without providing

adequate notice and opportunity to comment.  5 U.S.C. § 706(2) (A)-(D).

83.     Under the APA, EPA is required to provide DC Water with notice of and an

opportunity to comment on the Blue Plains WLAs.  Although the final maximum daily Blue

Plains WLAs need not have been identical to those proposed in the notice, to satisfy this

requirement, they must be a "logical outgrowth" of the notice.  *See, e.g.*, *Environmental Integrity*

*Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

84.     The Blue Plains maximum daily WLAs in the two draft versions that were noticed

on February 8, 2013, and May 30, 2014, proposed WLAs that were not only completely different

from the maximum daily WLAs that were ultimately established in the final E. coli TMDL, but

also were calculated using an approach and inputs that were completely different from those

proposed in the notices.  Moreover, the notices did not indicate or suggest in any way that EPA

and DDOE were considering the maximum daily WLAs or the approaches and inputs to

calculating the WLAs in the final WLAs.

85.     In approving the E. coli TMDL EPA violated the APA's notice-and-comment

requirement because the final maximum daily WLAs for Blue Plains were not a logical

outgrowth of the draft WLAs that were noticed for comment, and therefore, deprived DC Water

of notice and the opportunity to comment on the final maximum daily Blue Plains WLAs.

## EIGHTH CLAIM
## EPA Failed to Consider Comments and Explain Why It Rejected Plausible Alternatives

86.     All preceding paragraphs of this Complaint are incorporated by reference and re-alleged as if fully set forth in this eighth claim.

87.     When the EPA chooses notice-and-comment rulemaking it is required to consider comments and explain why it rejected plausible alternative approaches to the final rule as part of the general statement of "basis and purpose" required by 5 U.S.C. § 553(c).

88.     In approving the E. coli TMDL EPA further violated the APA's notice-and-comment requirement because it did not explain why it rejected plausible alternative approaches to calculating the maximum daily WLAs for Blue Plains.

## PRAYER FOR RELIEF

WHEREFORE, DC Water respectfully requests that this Court:

1.     Declare that EPA's action approving the E. coli TMDL was contrary to the CWA and the Administrative Procedure Act; arbitrary, capricious; an abuse of discretion; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction authority, or limitations, or short of statutory right; without observance of procedure required by law; in excess of statutory authority; or otherwise not in accordance with law;

2.     Vacate  approval of the E. coli TMDL;

3.     Enjoin and restrain EPA from enforcing, applying, or implementing (or requiring others to enforce, apply, or implement) the E. coli TMDL;

4.     Retain jurisdiction over the action to ensure compliance with the Court's Order;

5.     Award DC Water its costs of litigation; and,

6.     Grant such relief as this Court deems necessary and proper.

DATED:  November 23, 2015

Respectfully submitted,

By:    /s/ Dale G. Mullen
    David E. Evans (D.C. Bar No. PA0017)
    E. Duncan Getchell, Jr. (D.C. Bar No. VA008)
    Dale G. Mullen (D.C. Bar No. VA48956)
    McGuireWoods LLP
    Gateway Plaza
    800 East Canal Street
    Richmond, VA 23219
    (804) 775.4710
    devans@mcguirewoods.com
    dgetchell@mcguirewoods.com
    dmullen@mcguirewoods.com

    *Counsel for Plaintiff District of Columbia Water and Sewer Authority*

Of Counsel:

Randy E. Hayman
General Counsel
Gregory Hope
Principal Counsel
District of Columbia Water and Sewer Authority
5000 Overlook Avenue, SW
Washington, DC 20032
(202) 787.2254